[Cite as *Early Church of God in Christ, Inc. v. Jackson*, 2022-Ohio-4034.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


EARLY CHURCH OF GOD IN CHRIST, INC.,     :     APPEAL NO. C-220115
TRIAL NO. A-2200864

    Plaintiff-Appellant,     :

    :     *O P I N I O N.*

    vs.     :

    :

RICHARD L. JACKSON,     :

    and     :

JOYCE E. RAGLIN,

    Defendants-Appellees.


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: November 14, 2022


*Frost Brown Todd LLC, Charles B. Galvin*, for Plaintiff-Appellant,

*V. Gayle Miller,* for Defendants-Appellees.

**BERGERON, Presiding Judge.**

{¶1} A dying bishop, a simmering feud over his successor, and allegations of misappropriated assets provide the backdrop to this church property dispute. Plaintiff-appellant Early Church of God in Christ, Inc., ("ECOGIC") sued defendants-appellees Richard Jackson and Joyce Raglin (erstwhile leaders of ECOGIC) for misappropriation of church property and assets. The trial court, however, sua sponte dismissed the complaint, finding that the ecclesiastical abstention doctrine stripped it of subject matter jurisdiction and compelled dismissal. ECOGIC now appeals, and based on our review of the allegations in the complaint, we find that claims two and three (for breach of fiduciary duties and demand for an accounting) satisfy the minimal requirements necessary to survive dismissal at the pleading stage. By contrast, the first count (for trespass), frames a purely ecclesiastical dispute, and we accordingly affirm that aspect of the trial court's decision. We accordingly reverse the trial court's decision in part, affirm it in part, and remand this cause for further proceedings consistent with this opinion.

I.

{¶2} ECOGIC, a nonprofit corporation, operates two churches, both located in the greater Cincinnati area. The "Guide to Govern the Early Church of Christ" ("ECOGIC Guide") governs all facets of ECOGIC's operations, and its board of elders presides over matters of governance. When the events at issue arose, the elders included Senior Bishop Rufus L. Bryant, Junior Bishop John T. McCauley, and Mr. Jackson (in addition to several other congregants). Ms. Raglin served as a secretary and a pastor for ECOGIC.

2

{**¶3**}    In October 2021, a number of individuals within ECOGIC's congregation received a letter that purported to be authored by then-Senior Bishop Bryant.  The letter ostensibly followed a meeting at which he allegedly demoted Mr. McCauley from his role as junior bishop, while simultaneously elevating Mr. Jackson to the role of assistant bishop.  The letter caused quite a stir among the congregation. Some members questioned its authenticity, given that Senior Bishop Bryant was in failing health, and in fact passed away shortly thereafter in November.  Moreover, according to the ECOGIC Guide, the then-senior bishop lacked the authority to demote Mr. McCauley and elevate Mr. Jackson without proper approval by the board of elders or the church's general assembly (neither of which, as we understand it, had occurred).

{**¶4**}    Over the next few months, a majority of the elders voted to appoint Mr. McCauley as interim presiding bishop until ECOGIC's annually-scheduled general assembly meeting in August 2022, where an official vote for senior bishop would occur.  Disregarding this action, Mr. Jackson, with the assistance of Ms. Raglin, planned a consecration ceremony at one of ECOGIC's churches to install himself as bishop, and continued to promote the ceremony even after receiving a cease and desist letter from ECOGIC.  ECOGIC generally claims that Mr. Jackson and Ms. Raglin utilized their positions of trust and misappropriated church property, as they effectively seized control of certain church assets, including bank accounts.

{**¶5**}    Unable to resolve the dispute, in March 2022, ECOGIC filed a complaint against Mr. Jackson and Ms. Raglin.  In it, ECOGIC asserted claims for trespass, breach of fiduciary duty, and a demand for an accounting and inspection of assets and records within defendants' exclusive control.  At the same time, ECOGIC filed a motion for a temporary restraining order and preliminary injunction with the trial court,

seeking to enjoin the misappropriation of assets. The afternoon of the filing, the trial court issued an order granting the motion for a temporary restraining order. The following day, however, the trial court reversed course, sua sponte vacating the temporary restraining order and dismissing the case for lack of subject matter jurisdiction due to the ecclesiastical abstention doctrine. ECOGIC now appeals.

II.

{¶6} In its sole assignment of error, ECOGIC maintains that the trial court erred in dismissing its complaint sua sponte. Specifically, ECOGIC insists that the issues raised in its complaint present purely secular questions that courts can resolve through the application of neutral principles of law. ECOGIC also faults the trial court for failing to provide notice to it before dismissing its complaint.

{¶7} Appellate courts conduct a de novo review of a trial court's decision to dismiss a complaint for lack of subject matter jurisdiction pursuant to Civ.R. 12(B)(1). *Bla-Con Indus. v. Miami Univ.*, 12th Dist. Butler No. CA2006-06-127, 2007-Ohio-785, ¶ 7. "This [review] involves a determination of whether the complaint raised any cause of action cognizable by the forum in which it was filed." *Id.* In determining its jurisdiction over the matter, "the court is not required to accept the allegations of the complaint as true but may take into account facts established in the record." *Duke Energy One, Inc. v. Cincinnati State Technical and Community College*, 2022-Ohio-924, 187 N.E.3d 28, ¶ 12 (1st Dist.).

A.

{¶8} Before we turn to the questions at hand, we provide some context on the history of church property disputes. Our jumping-off point for this inquiry is 1871, where the United States Supreme Court, in *Watson v. Jones*, 80 U.S. 679, 20 L.Ed.

4

666 (1871), upheld the command of the First Amendment to abstain from interfering in disputes within religious organizations concerning religious practice, doctrine, or internal organization—principles reflected in the ecclesiastical abstention doctrine. But that doctrine does not preclude courts from wading into any disputes involving religious entities. *Watson* at 714 ("Religious organizations come before [civil courts] in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property, or of contract, are equally under the protection of the law, and the actions of their members subject to its restraints."). As the Supreme Court recognizes, courts do have certain (and relatively confined) roles in adjudicating church-related disputes consistent with the mandates of the First Amendment.

{¶9} In *Watson*, the Supreme Court confronted a schism within a church that resulted in two distinct bodies of members, each claiming the exclusive use of the property owned by that church. *Id.* at 714. In response, the Court crafted a two-part framework for courts to approach church property disputes that distinguishes "congregational" churches from "hierarchical" churches. Congregational churches are those which, "by the nature of [their] organization, [are] strictly independent of other ecclesiastical associations, and so far as church government is concerned, owe[] no fealty or obligation to any higher authority." *Id.* at 722. When approaching a property dispute within a congregational church, civil courts should apply the "ordinary [legal] principles which govern voluntary associations." *Id.* at 725.

{¶10} Hierarchical churches, on the other hand, are those "where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control * * * over the whole membership

5

of that general organization." *Id.* at 722-723. When faced with a dispute within a hierarchical church, "whenever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them." *Id.* at 727. This is because, according to the *Watson* court, "[a]ll who unite themselves to such a [religious] body do so with an implied consent to this government, and are bound to submit to it." *Id.* at 729. And "[i]t would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of [a religious body's] decisions could appeal to the secular courts and have them reversed." *Id.*

{¶11} Over a century later, the Supreme Court would elaborate on its approach to church property disputes in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). In *Jones*, a hierarchical church sought resolution of a property dispute wherein a majority of its members voted to separate from the church and appropriated property from the original church to establish their new sect. *Id.* at 597. Confronted with the issue of whether courts may resolve church property disputes on the basis of "neutral principles of law," or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church even where no issue of doctrinal controversy is involved, the Court delved into the mandates of the First Amendment and *Watson*. *Id.* at 602.

{¶12} The Court began by noting that, besides the limitations of the First Amendment and precedent, no authority establishes a particular method that a civil court must follow in resolving church property disputes. *Id.* Here, the Supreme Court ultimately endorsed Georgia's use of the "neutral principles of law" approach in the

case below, finding this approach to comport with constitutional requirements. Under the neutral principles approach, "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." *Id*. at 604. The Court also rejected a rule of compulsory deference to religious bodies because this approach would at times require "a searching and therefore impermissible inquiry into church polity." *Id*. at 605, quoting *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 723, 96 S.Ct. 2372, 49 L.E.2d 151 (1976). In *Jones*, on the understanding that the church was hierarchical and no controversy regarding religious doctrine existed, the Court remanded the case with instructions to apply neutral principles of state property law to the facts of the case.

{¶13} Ohio courts have long subscribed to the "neutral principles" approach endorsed by *Jones*. In *Serbian Orthodox Church Congregation of St. Demetrius v. Kelemen*, 21 Ohio St.2d 154, 256 N.E.2d 212 (1970), a dispute arose between a church and a group of parishioners. The individual parishioners requested that the court hold that the mother church unlawfully withheld and usurped their rights to the use of the church property. On remand from the United States Supreme Court, the Supreme Court of Ohio held that the determination of the right to possession and control of church property must be restricted to the utilization of "neutral law principles." *Kelemen* at 161. The court evaluated the parties' respective property rights by looking to Ohio law on not-for-profit corporations and "other secular instruments not requiring the resolution of religious tenets or doctrine." *Id*. at 162.

{¶14} But the first step generally remains that the trial court must conduct an inquiry to determine whether the church is hierarchical or congregational (unless the parties agree as to the nature of the church structure). In *State ex rel. Morrow v. Hill*,

7

51 Ohio St.2d 74, 364 N.E.2d 1156 (1977), the Supreme Court of Ohio confirmed that the proper method for a trial court to determine whether a church is hierarchical is through "the utilization of a broad spectrum of factual matters demonstrating the local church's participation in the affairs of the national church and an adherence to the national church's prescribed procedure before the dispute arose." *Id.* at syllabus. The court referred to this inquiry as the "Living Relationship Test." *Id.* at 80. Conversely, to determine that a church is congregational, courts consider various factors, including whether the congregation governs itself or whether it is subservient to another body. If it is self-governing and controlled by no greater ruling organization, it is congregational. *See Bhatti v. Singh*, 148 Ohio App.3d 386, 2002-Ohio-3348, 773 N.E.2d 605, ¶ 26 (12th Dist.).

{¶15} If the court concludes—or the parties agree—that a church is hierarchical, the court must defer to "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Tibbs v. Kendrick*, 93 Ohio App.3d 35, 42, 637 N.E.2d 397 (8th Dist.1994), quoting *Milivojevich*, 426 U.S. at 713, 96 S.Ct. 2372, 49 L.E.2d 151. "However, where the dispute involves non-doctrinal contractual disputes, a civil court retains jurisdiction to hear the dispute." *Tibbs* at 42. So long as a church property dispute does not implicate "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law," *id.*, the trial court may invoke neutral principles of law to determine church property ownership. *See Kelemen*, 21 Ohio St.2d at 161, 256 N.E.2d 212, quoting *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem. Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (in cases involving hierarchical churches,

8

*Hull Memorial* "clearly restricts the determination of the right to possession and control of church property to the utilization of neutral law principles.").

**{¶16}** In cases involving hierarchical churches, the neutral principles approach, as set forth in *Jones* and applied by Ohio courts, can also require the civil court to examine religious documents, including the church constitution, for language of trust in favor of the general church. *See Harrison v. Bishop*, 2015-Ohio-5308, 44 N.E.3d 350, ¶ 37 (6th Dist.); *see also African Methodist Episcopal Church v. St. Johns African Methodist Episcopal Church*, 5th Dist. Tuscarawas No. 08AP050037, 2009-Ohio-1394, ¶ 38. But this inquiry must be undertaken "in purely secular terms," and the court cannot rely on "religious precepts in determining whether the document indicates that the parties have intended to create a trust." *Harrison* at ¶ 37.

**{¶17}** If, on the other hand, the church is congregational, the next stage of inquiry explores whether the dispute is ecclesiastical or secular. *Tibbs* at 43. A church can invoke the jurisdiction of courts over secular issues but not ecclesiastical matters. *See Ciganik v. York*, 11th Dist. Portage No. 2013-P-0018, 2013-Ohio-5834, ¶ 22-25; *see also Robinson v. Freedom Faith Missionary Baptist Church*, 2d Dist. Montgomery No. 20232, 2004-Ohio-2607, ¶ 27 ("This Court has subject matter jurisdiction only if the dispute involves secular issues."). Secular matters are those capable of being resolved without delving into areas of church dogma or interpreting doctrinal beliefs. *Hudson Presbyterian Church v. Eastminster Presbytery*, 9th Dist. Summit No. 24279, 2009-Ohio-446, ¶ 10. In order to determine whether the dispute in a case is ecclesiastical or secular in nature, courts must "look to the allegations contained in [the] complaint." *Harrison* at ¶ 42.

9

{¶18}  For example, in *Slavic Full Gospel Church, Inc. v. Vernyuk*, 8th Dist. Cuyahoga No. 97158, 2012-Ohio-3943, which involved a congregational polity, the court affirmed the trial court's subsequent consideration of "whether the nature of the dispute was ecclesiastical or secular" and its review of the complaint to determine "whether the controversies presented in each count require determination of ecclesiastical or secular issues." *Id.* at ¶ 18-21, quoting *Tibbs*, 93 Ohio App.3d at 43, 637 N.E.2d 397.  Because the basis of the lawsuit surrounded alleged "unchristian like behaviors" of the parties, the trial court properly found that it lacked jurisdiction over the case, as resolution of the dispute would require the court to trespass onto the ecclesiastical realm.  *Id.* at ¶ 21-23.

{¶19}  If the court concludes that the church is congregational and the nature of the dispute is secular, then it proceeds to apply neutral principles of law to the dispute.  To the extent that ecclesiastical matters surface before a civil court, the court retains "jurisdiction in cases involving congregational churches to determine whether the proper authority made the decision about church discipline or policy." *Mullins v. Wicker*, 4th Dist. Pike No. 16CA872, 2017-Ohio-5663, ¶ 22.  But the court's "role is only to identify that authority, not to review its decisions." *Shariff v. Rahman*, 152 Ohio App.3d 210, 2003-Ohio-1336, 787 N.E.2d 72, ¶ 15 (8th Dist.).  "This is so because a congregational church, unlike a hierarchical church, lacks a higher authority in determining whether such a decision was made by the appropriate church authority." *Sacrificial Missionary Baptist Church v. Parks*, 8th Dist. Cuyahoga No. 71608, 1997 Ohio App. LEXIS 5308, *8 (Nov. 26, 1997).

10

B.

**{¶20}**  With this background in mind, we now turn to the case before us.  In the first count of the complaint, ECOGIC requests issuance of a preliminary and permanent injunction prohibiting Mr. Jackson and Ms. Raglin from entering onto certain church property in order to prevent Mr. Jackson from convening an event to consecrate himself as bishop.  The complaint alleges that, if the "false consecration ceremony" proceeded, it would "desecrate the Samaria ECOGIC church" and would "undermin[e] the ecclesiastical authority of [ECOGIC's] Elders."  The question of whether an action is canonical or might desecrate the sanctity of a church is a paradigmatically ecclesiastical one, over which civil courts have no subject matter jurisdiction, regardless of whether the church is hierarchical or congregational.[1]  *See Tibbs* at 41 ("It is well established that civil courts lack jurisdiction to hear or determine purely ecclesiastical or spiritual disputes of a church or religious organization.").  Because resolution of this claim would require us to intrude on matters of faith, we simply cannot apply neutral principles of law to resolve it, and thus it presents the quintessential type of claim that courts must steer clear of.  We thus affirm the trial court's determination that it lacked subject matter jurisdiction pursuant to the ecclesiastical abstention doctrine over ECOGIC's first count for trespass.

**{¶21}**  We reach a different conclusion with regard to ECOGIC's second and third claims for relief, at least based on the existing state of the record.  In its cause of

---

[1] To be sure, in certain limited circumstances a court could consider an ecclesiastical question, but only to ascertain if the broader church (in a hierarchical church) or the appropriate body (in a congregational church) made the requisite decision.  The complaint does not present either such scenario.

action for breach of fiduciary duty, ECOGIC seeks injunctive relief prohibiting Mr. Jackson and Ms. Raglin from spending ECOGIC funds or further using ECOGIC property for any purpose without the prior written consent of ECOGIC. ECOGIC's third cause of action requests an accounting and inspection of assets and records belonging to ECOGIC and that are now within the hands of Mr. Jackson and Ms. Raglin.

{¶22} Here, ECOGIC's complaint does not plead facts from which we can ascertain whether it is hierarchical or congregational, nor did the trial court make that threshold determination in deciding to dismiss the complaint. However, based on our reading of the allegations in the complaint, the court has jurisdiction over ECOGIC's second and third counts for breach of fiduciary duty and demand for an accounting pursuant to either line of inquiry.[2]

{¶23} If ECOGIC is hierarchical, then we must defer to the decisions of the church's highest governing body on "matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Tibbs*, 93 Ohio App.3d at 42, 637 N.E.2d 297, quoting *Milivojevich*, 426 U.S. at 713, 96 S.Ct. 2372, 49 L.E.2d 151. Here, however, considering the allegations contained in the complaint, ECOGIC's counts for breach of fiduciary duty and demand for an accounting present secular issues capable of resolution by neutral principles of law. *See Tibbs* at 42; *see also Kelemen*, 121 Ohio St.2d at 161, 256 N.E.2d 212. ECOGIC alleges that defendants seized control of ECOGIC's bank accounts as well as other important organizational and financial

---

[2] We emphasize that we reach this conclusion based on the allegations of the complaint. If, after further record development, it appears that ECOGIC is actually seeking a resolution of ecclesiastical matters, the trial court may revisit the subject matter jurisdiction question consistent with the analysis presented in this opinion.

records, and alienated ECOGIC real property, all without the requisite authority to do so. As we understand the nature of these claims, they appear no different than if a non-religious organization had an officer who ran off with company funds.

**{¶24}** At least according to the allegations of the complaint, we see no need to consult questions of faith to resolve this dispute, just as other courts have found in cases similar to the one before us. In *Kansas St. James Ohio v. Catholic Diocese of Toledo*, 3d Dist. Seneca No. 13-08-19, 2008-Ohio-6577, the trial court resolved a church property dispute involving a hierarchical church, where former parishioners of a Catholic parish requested that a bishop of the Catholic Church be divested of legal title to certain real property and that the property remain in trust for the benefit of former parishioners who broke off from the church. The parishioners included fiduciary breach and demand for accounting claims in their complaint. *Id*. at ¶ 6. The trial court ultimately granted summary judgment in favor of the bishop, pursuant to the terms of the trust in favor of the Catholic Church that dictated that the property be held for the use of the general church. *Id*. at ¶ 26. Because resolution of the property issue did not implicate religious matters, but rather turned on the terms of the trust which governed the distribution of church property in a neutral manner, the court properly exercised its jurisdiction over the case. *Id*. at ¶ 29. Or consider *Christensen v. Roumfort*, 20 Ohio App.3d 107, 485 N.E.2d 270 (7th Dist.1984), where the court held that members of a national hierarchical church were not entitled to order the dissolution of a local church that had appropriated the greater church's name. *Id*. at 110. The mother church attempted to dissolve the local church in accordance with their faith's Book of Order and sought an accounting of all church property and that the local church turn over all its real and tangible personal property. *Id*. at 107. The

13

court found, "The issue in this case * * * is not discipline. It is, who owns the property – a civil issue." *Id.* at 109. Accordingly, the court measured the claims against Ohio law governing real property held by nonprofit organizations, as well as the language of the deed and secular governing church documents, to resolve the case. *Id.* at 110.

**{¶25}** In its second and third claims for relief, ECOGIC is requesting that the court apply neutral property laws and consider church governing documents in an endeavor to resolve a property dispute. Just as the cases we consider above, as far as we can tell, the case before us may be resolved without inquiry into religious doctrine or discipline, and there exist neutral laws governing the issue. ECOGIC does not invoke religious tenets or ecclesiastical references in its complaint; rather, it simply contends that members of its congregation stole money and property that rightfully belonged to the church, which can be resolved consistent with state common law that would apply to any nonprofit organization.

**{¶26}** Therefore, if ECOGIC is hierarchical, the trial court may invoke neutral principles of law with regard to counts two and three in the complaint to divine the property rights of the parties. *See Kelemen*, 21 Ohio St.2d at 161, 256 N.E.2d 212. And in applying neutral principles of law to a property dispute within a hierarchical church, the court should also inquire into whether a trust exists in favor of the general church that might implicate any of the property or assets at issue in the complaint. *African Methodist Episcopal Church*, 5th Dist. Tuscarawas No. 08AP050037, 2009-Ohio-1394, at ¶ 38.

**{¶27}** If ECOGIC is a congregational church, then the next stage of inquiry is whether counts two and three in the complaint present secular or ecclesiastical questions. *Ciganik*, 11th Dist. Portage No. 2013-P-0018, 2013-Ohio-5834, at ¶ 22-25.

14

Here, as discussed above, based on the facts alleged in the complaint, ECOGIC's second and third counts for breach of fiduciary duty and demand for an accounting appear to present secular issues. So long as these secular issues do not necessarily implicate the resolution of ecclesiastical matters, then the court shall proceed to apply neutral principles of law to the property dispute. *See Mullins*, 4th Dist. Pike No. 16CA872, 2017-Ohio-5663, at ¶ 22.

{¶28} We contrast the allegations at hand with some similar causes of action that other courts have found to present ecclesiastical questions. In *Harrison*, 6th Dist. Lucas No. L-14-1137, 2015-Ohio-5308, for example, the trial court lacked jurisdiction over the congregational church property dispute because the plaintiffs relied on the religiously-oriented church constitution to support their allegation that the defendants breached their financial duties. Punctuated with doctrinal statements and references to biblical passages, establishing, for example, that "[a]ll provisions herein are declared to be subjected to the Word of God, as found in the King James Version or other translations of the Holy Bible," the constitution led the court to deem it impossible to separate the ecclesiastical from the secular. *Id*. at ¶ 43. The plaintiffs reinforced that conclusion by relying on ecclesiastical content in their church constitution to illustrate how the defendants had wandered astray of their fiduciary obligations. *Id*. at ¶ 45-47. Similarly, in *Robinson*, 2d Dist. Montgomery No. 20232, 2004-Ohio-2607, a parishioner brought an action demanding an audit and accounting of the church's financial records, accounts, and transaction, for the purpose of contesting the legitimacy of the pastor. Because the inquiry into church finances would require the church to consider whether the pastor should be removed—which

15

often poses an ecclesiastical question—the court determined that it lacked jurisdiction over the dispute. *Id.* at ¶ 28.

{¶29} In the case before us, ECOGIC does not rely on ecclesiastical provisions in its governing documents to support its allegations, nor does it ask the trial court to determine who is the proper church leader. As would be true if ECOGIC were hierarchical, the court can resolve the secular issues that it raises in its second and third claims for relief if it determines that ECOGIC is congregational. Therefore, if ECOGIC is a congregational organization, the trial court may properly exercise jurisdiction over counts two and three of the complaint based on the present allegations of the complaint.

{¶30} Accordingly, regardless of whether ECOGIC is a hierarchical or congregational organization, its second and third counts for breach of fiduciary duty and demand for an accounting present matters which, unless information to the contrary arises further into the proceedings, the trial court may resolve through the application of neutral principles of law.

{¶31} ECOGIC also argues that the trial court violated its constitutional right to procedural due process by dismissing the case without providing notice or an opportunity to be heard. Because we are reversing the trial court's dismissal as to ECOGIC's second and third claims, and because the trial court properly dismissed the first claim, these dispositions render this question moot. *See State ex rel. Ford v. Ruehlman*, 149 Ohio St.3d 34, 2016-Ohio-3529, 73 N.E.3d 396, ¶ 55, quoting *State v. Moore*, 4th Dist. Adams No. 13CA987, 2015-Ohio-2090, ¶ 7 ("An issue is moot 'when it has no practical significance, and, instead, presents a hypothetical or academic question.' "). However, this case illustrates the perils of a trial court sua sponte

dismissing a nonfrivolous complaint. If the court had requested ECOGIC's perspective prior to dismissing, many of these issues might have been considered and decided, which would have provided us with a complete record to evaluate. Now, however, the parties must return to square one and start anew. For that reason, trial courts "should generally give notice of the court's intent to dismiss and an opportunity to respond," even though a "sua sponte dismissal without prior notice is not void as a due process violation." *Northland Ins. Co. v. Poulos*, 7th Dist. Mahoning No. 06MA160, 2007-Ohio-7208, ¶ 44-45. The de minimis delay occasioned by notice and a chance to respond can often avoid judicial inefficiencies and squandered resources by the parties.

\*　　\*　　\*

**{¶32}** In light of the foregoing analysis, we sustain ECOGIC's assignment of error in part, reversing the trial court's dismissal of ECOGIC's complaint with respect to the second cause of action for breach of fiduciary duty and the third cause of action for demand for an accounting and inspection, and remanding these matters to the trial court for further proceedings consistent with this opinion. We affirm the judgment of the trial court and we overrule ECOGIC's assignment of error with respect to the dismissal of first cause of action.

Judgment affirmed in part, reversed in part, and cause remanded.

**WINKLER** and **BOCK, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

17